250 N.J. Super. 51 (1991)
593 A.2d 367
JOHNSON MATTHEY INC., PLAINTIFF-APPELLANT,
v.
PENNSYLVANIA MANUFACTURERS' ASSOCIATION INSURANCE COMPANY, AMERICAN CASUALTY COMPANY, FEDERAL INSURANCE COMPANY AND CONTINENTAL CASUALTY COMPANY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 31, 1990.
Decided July 23, 1991.
*52 Before Judges KING, LONG and R.S. COHEN.
Zulima V. Farber argued the cause for appellant (Lowenstein, Sandler, Kohl, Fisher & Boylan, attorneys, Zulima V. Farber of counsel and Zulima V. Farber and Marc B. Kramer on the brief).
John Zen Jackson argued the cause for respondent Pennsylvania Manufacturers' Association Insurance Company (Jackson & Vaurio, attorneys, John Zen Jackson and Ann Marie Vaurio on the brief).
Thomas P. Farnoly argued the cause for respondents American Casualty Company and Continental Casualty Company (Gruccio, Pepper, Giovinazzi & DeSanto, and Bromley, *53 Brown & Walsh, attorneys, Thomas P. Farnoly of counsel and Thomas P. Farnoly and James W. Greene on the brief).
James B. Burns argued the cause for respondent Federal Insurance Company (Clark, Ladner, Fortenbaugh & Young, attorneys, Jeffrey A. Smith of counsel and James B. Burns on the brief).
The opinion of the court was delivered by R.S. COHEN, J.A.D.
Johnson Matthey, Inc. (JMI), is a Pennsylvania corporation. It has headquarters and does business primarily in Pennsylvania. It is authorized to do business in New Jersey, and has operated a manufacturing plant in Winslow, New Jersey, for some time. In this case, JMI sued a number of its liability insurers for declarations that their policies cover liabilities and costs arising out of litigation in which charges were made against JMI that waste from its Winslow plant went to four different disposal sites, all in New Jersey.
In one case, involving the cleanup of Price's Landfill, there was a settlement with the Federal Government to which JMI contributed some $2.5 million. There were also toxic tort claims relating to Price's Landfill, to the settlement of which JMI contributed some $200,000, and claims relating to the KinBuck Landfill, to the settlement of which JMI contributed some $6,000. There are also yet-unquantified remediation cost claims relating to three landfills, to which JMI may have to contribute.
The defendant insurers all provided JMI with general liability coverage, at various times, either as primary, excess or umbrella insurers. In this litigation, they raised a number of issues, all still unresolved,[1] in opposition to JMI's complaint for coverage. In late 1989, JMI made an in limine motion for a ruling *54 as to what state's body of substantive law governed the issues to be decided in the case. The motion judge ruled that Pennsylvania law controlled. JMI was granted leave to appeal, and we reverse.
The primary insurance coverage issue is whether leakage of pollutants onto the land is a "sudden and accidental" occurrence. This is a concept appearing in the policies; Pennsylvania and New Jersey courts have reached different interpretations of the phrase. Both states say that coverage is afforded to sudden and accidental discharges of pollutants. Pennsylvania rules, however, that a pollution discharge occurring gradually over time is not sudden and accidental. Lower Paxton Tp. v. United States Fidelity and Guar. Co., 383 Pa.Super. 558, 557 A.2d 393 (1989). New Jersey holds to the contrary that sudden and accidental discharges include a gradual release of pollutants. Broadwell Realty Serv., Inc. v. Fidelity & Cas. Co., 218 N.J. Super. 516, 528 A.2d 76 (App.Div. 1987). The resolution of this particular coverage issue is apparently of great significance to the parties.
Although the "sudden and accidental" coverage issue is the one that is now foremost in the litigants' minds, the in limine ruling made by the Law Division Judge apparently related to every substantive issue that might arise in the litigation between JMI and its insurers. The March 30, 1990 order recites that plaintiff JMI asked for an in limine ruling "on which law should apply to determinations of law and fact in the disposition of this case," and then orders "that Pennsylvania law shall be applied in this case."
Our choice-of-law approach is governed by State Farm Mut. Auto. Ins. Co. v. Simmons' Estate, 84 N.J. 28, 417 A.2d 488 (1980). There, the Supreme Court concluded
that the proper approach in resolving conflict-of-law issues in liability insurance contract controversies... calls for recognition of the rule that the law of the place of the contract ordinarily governs the choice of law because this rule will generally comport with the reasonable expectations of the parties concerning the principal situs of the insured risk during the term of the policy and will furnish needed certainty and consistency in the selection of the applicable law. *55 At the same time, this choice-of-law rule should not be given controlling or dispositive effect. It should not be applied without a full comparison of the significant relationship of each state with the parties and the transaction. That assessment should encompass an evaluation of important state contacts as well as a consideration of state policies affected by, and governmental interest in, the outcome of the controversy. [Id. at 37, 417 A.2d 488 (citations omitted)].
The Simmons Court discussed with approval the "most significant relationship" standard of the Restatement (Second) of Conflict of Laws Sec. 188 (1971),[2] and the specific treatment of casualty insurance policies in Restatement Sec. 193:
The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in Sec. 6 to the transaction and parties, in which event the local law of the other state will be applied.
Restatement Sec. 6, to which the Sec. 193 refers, lists the factors relevant to every choice of law in the absence of a statutory directive.[3]See generally Appleman, Insurance Law and Practice § 7076 (1981).
*56 A complication presented by this case is that it seems to proceed simultaneously on two levels, treating two different matters as one. The first is the proper choice of law on which to decide the question of the meaning of the "sudden and accidental" policy language. The second is the proper disposition of the global conflicts question of what state's law "shall be applied in this case." The trial judge treated the two matters as one, and the parties have followed suit. We will first deal with the issue of which state's law determines the meaning of "sudden and accidental," and then with the proper disposition of the global conflicts question.

I.
The Law Division Judge ruled for the application of Pennsylvania law, noting that JMI is a Pennsylvania corporation, the insurance agent was a Pennsylvania corporation, and all of the significant aspects of the execution of the policies took place in Pennsylvania, including payment of premiums, correspondence between the parties, and the domicile and business locations of the parties. The Judge went on to quote an unpublished New Jersey trial court opinion to the effect that the existence of a landfill problem in New Jersey and the insured's relationship to property there do not give New Jersey an interest in the insurance dispute between the parties, and further that the nature of the tort is not a legitimate factor to consider in determining what law to apply; that would destroy any consistency, "which is repugnant to the nature of the bargaining process." The Judge in the present case went on to *57 say that New Jersey has no significant interest in the financial aspects of cleaning toxic waste sites with insurance proceeds rather than the funds of JMI. Finally, he said, the interpretation of a contract should not rest on the law of each state in which a toxic tort claim or an environmental claim has been made. Instead, the goal should be a single, consistent and final resolution of the choice of law question, and that requires application of Pennsylvania law.
We disagree. The existence or absence of insurance proceeds can very well determine whether or not a waste site is remediated or a toxic tort victim is compensated. Not every polluter or other person responsible for an environmental wrong is financially sound, or is anxious to make personal assets available to satisfy adjudicated liabilities. New Jersey's paramount interest in the remediation of toxic waste sites, and in the fair compensation of victims of pollution, extends to assuring that casualty insurance companies fairly recognize the legal liabilities of their insureds. In Continental Ins. Cos. v. Northeastern Pharmaceutical & Chem. Co., 842 F.2d 977, 985 (8th Cir.), cert. denied, 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988), the Court of Appeals characterized the availability of comprehensive liability insurance coverage for the costs of cleaning up hazardous waste sites as a question of substantial importance to the public. See also Leksi, Inc. v. Federal Ins. Co., 736 F. Supp. 1331 (D.N.J. 1990); Sandvik, Inc. v. Contintental Ins. Co., 724 F. Supp. 303 (D.N.J. 1989).
New Jersey's urgent concern is for the health and safety of its citizens. It is demonstrated by the enactment of the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 et seq.; the Solid Waste Management Act, N.J.S.A. 13:1E-1 et seq.; the Sanitary Landfill Facility Closure and Contingency Fund Act, N.J.S.A. 13:1E-100 et seq.; the Environmental Cleanup Responsibility Act, N.J.S.A. 13:1K-6 et seq.; and the Water Pollution Control Act, N.J.S.A. 58:10A-1 et seq.; see also N.J.S.A. 23:5-28 et seq. The gravity of the problem is out of doubt; the *58 necessity of finding solutions is manifest. In the effort to find solutions, financial resources matter.
Pennsylvania's interest is relatively remote. As the locale of much of the creation of the insurance contracts, Pennsylvania has an interest in some of their aspects. It has no legitimate interest, however, in preventing the fair and predictable application of foreign law to Pennsylvania insurance contracts which are written to cover insureds' liabilities in other states. It may assert an interest, contrary to JMI's position, in the uniform interpretation of Pennsylvania insurance contracts in other states. We are satisfied, however, that such a goal is illusory and must give way to New Jersey's paramount interest in the health and safety of its people.
The insurance companies issued policies which expressly or by necessary implication cover "sudden and accidental" discharges of pollutants at JMI's New Jersey plant.[4] They also cover "sudden and accidental" discharges in other jurisdictions. If JMI had plants in 50 states, and its insurer was qualified to do business in all of them, its policy would cover "sudden and accidental" discharges and other liabilities in 50 states. In that case, the insurer would cover JMI under 50 different bodies of law. If injured trespassers are well protected by the tort law of one state, the nationwide insurance policy covers the risk. If they have few rights in another state, the policy covers a smaller risk. The point is that the hypothetical Pennsylvania insurance policy, despite uniform policy language, expands and contracts to afford adequate coverage to its insured under the substantive law of each state.
Policy language interpretation is another matter. It may seem counterintuitive to ascribe to the same policy language one meaning on the east bank of the Delaware and another on *59 the west bank. That is not, however, a consideration, unless uniform interpretation has sufficient value to overcome the significant governmental interest of the various jurisdictions where the insured risks are located, or where the insured entity predictably is going to incur legal liabilities. In our view, it does not.
Both uniformity and predictability of interpretation are at stake. Predictability can be achieved just as easily with reference to 50 bodies of law as one. It is just that 50 are harder to keep track of. Predictability appears to be a minor virtue in view of the willingness of insurers to issue multi-site policies that will be subject to the unpredictable substantive law of many states fixing the liabilities of their insureds.
The value of uniformity is that it permits persons with knowledge of only one state's law to predict how policy language will be interpreted in 50 jurisdictions. However, the same nationwide policy language may mean different things to different states of contracting. True uniformity is possible only if one body of law governs all insurance contracts, no matter where they are made. The insurers themselves have acted as though they do not value uniformity very highly. They have not taken the simple and obvious step toward uniformity of inserting choice-of-law provisions in their policies. Such clauses may not always prevail, see Restatement (Second) of Conflicts Sec. 187 (1971), but they surely will in many situations.
If uniform interpretation weighed heavy, and we were therefore driven to decide what single state's law controlled the language of a single policy, we would find it hard to choose Pennsylvania's law to govern the meaning of "sudden and accidental." First, there are the significant relationships and the paramount interest of the states where the insured risks are located. Second, there is the dearth of significant ties to Pennsylvania. A phone call, a signature, the typing and mailing of a preprinted insurance policy, the issuance and deposit of *60 a premium check do not add up to significant Pennsylvania roots.
In these days of multistate insurers, multistate insureds, and instantaneous interstate transmission of voice and document, it is not easy to identify a state of contracting. A Delaware company, for example, secures a casualty insurance policy for a New Jersey site, among others, through a Philadelphia agent from an insurer with a Hartford home office that retains final underwriting approval on large policies. The handshake deal for the insurance is made over lunch in Manhattan. Choosing a locus contractu in such a case would be a difficult and perhaps pointless exercise. Pointless, because there is nothing about the choice that tells very much about the insurance transaction involved.
The insurers in this case knew they were issuing policies to cover New Jersey risks whose scope was measured by New Jersey law. Restatement Sec. 193 says that rights under a casualty policy should ordinarily be decided under the substantive law of the state which the parties understood was to be the principal location of the insured risk. Here, that is clearly New Jersey, where the JMI plant was located, and where JMI waste predictably found its way into landfills.
There is another reason why uniform interpretation according to the state of contract is an elusive goal. It is that there are two opposing axes of possible uniformity, and it is impossible to line up along both of them at the same time. One axis is uniform nationwide interpretation of a single policy's language. It may well serve some interests to have a single reading of coverage and exclusion language that will bind in every state. Of course, with some reservations, the parties can achieve that result by means of a contractual choice of law.[5]
*61 The opposing axis is uniform interpretation that is site-specific. JMI is one of dozens if not hundreds of parties charged with liabilities for pollution in the proceedings that occasioned this insurance coverage struggle. Like JMI, many of the others are multi-state insureds with national insurers. Their insurance policies were contracted in many states, cover many geographically scattered risks and contain standard language of coverage and exclusion.
The disposition of suits or administrative proceedings in these cases would be facilitated by a site-specific uniformity of interpretation. If each nationwide insurer comes to court with its own nationwide policy interpretation derived from a different state of contracting, the likelihood of conflict and confusion is clear.
The reason to choose the law of the state of contracting, in the absence of significant relationships and interests elsewhere, was explained in Simmons:
... because this rule will generally comport with the reasonable expectations of the parties concerning the principal situs of the insured risk ... and will furnish needed certainty and consistency in the selection of the applicable law. [84 N.J. at 37, 417 A.2d 488].
Where the subject matter is a single policy insuring a single vehicle that travels in various states, as in Simmons, the explanation is convincing. Where the policy covers many scattered risks, however, the reasonable expectations of the parties contracting for insurance for a particular risk can be satisfied if they know that policy language interpretation will follow the law at the site of the risk. Certainty and consistency are equally well satisfied.
We hold that a casualty insurance policy, wherever written, which is purchased to cover a New Jersey risk, alone or along with risks in other states, is subject to interpretation of its coverage and exclusion language according to New Jersey local law. Although this rule is peculiarly suitable to environmental litigation, in which large numbers of casualty insurance policies are involved, it is not limited to that setting.
*62 For the purpose of our holding, covering a New Jersey risk means at least covering a property or operation owned, occupied or conducted in New Jersey. It may mean more, but we need not look further today. But see Leksi, Inc. v. Federal Ins. Co., 736 F. Supp. 1331 (D.N.J. 1990).
We are aware that our holding is not in harmony with Westinghouse Elec. Corp. v. Liberty Mut. Ins. Co., 233 N.J. Super. 463, 559 A.2d 435 (App.Div. 1989). There, Westinghouse brought suit against 144 insurers for declarations of nationwide coverage of toxic tort claims and site remediation liabilities wherever located. The Law Division severed and dismissed all coverage claims arising out of events occurring outside of New Jersey. This court reversed, holding that Westinghouse was entitled to pursue its nationwide insurance coverage claims here in a single suit.
Although no choice-of-law issues were then ripe for decision, the Law Division judge expressed concern that the omnibus lawsuit would require application of the substantive law of a great number of states. In discussing that matter, Judge Pressler said:
While not intending to deprecate the legitimacy of local concern for and control over its own environmental contamination, we nevertheless cannot conceive that the operative contract language in a single set of insurance policies issued by a group of insurers for the purpose of providing integrated comprehensive coverage for nationwide risks could mean something different in every state of the union.... [W]hen comprehensive nationwide coverage is purchased, it is surely the expectation of both insured and insurer that what the insured has bought and the insurer has sold is a single protection from liability irrespective of the particular state law under which that liability is determined so long as the risk, whether or not ultimately resulting in liability, is within the policy coverage. [Id. at 476, 559 A.2d 435].
In Westinghouse, the court chose the uniformity axis of one policy-one interpretation over the opposing uniformity axis of one risk-one interpretation. Judge Brotman made the other choice in Leksi, Inc. v. Federal Ins. Co., 736 F. Supp. 1331 (D.N.J. 1990). The insured was a Pennsylvania corporation that operated in Pennsylvania and bought insurance there, and sent waste products to New Jersey for disposal. It sought the same *63 kind of declaration of coverage against several insurers sought by JMI here.
Judge Brotman ruled for New Jersey law on many of the same theses as persuade us. He summed up:
The rule adopted today provides a simple method for choosing post facto what state's law applies: in the absence of a choice of law provision, the state where the toxic waste comes to rest is the state whose law will apply, provided that it was reasonably foreseeable that the waste would come to rest there. With the exception of situations in which the adjoining states dispute their boundary, this rule is elegant in its simplicity and properly recognizes that the host state's interest in its environment is superior to that of the law of the place of the contract. Although this rule may not provide unerring clarity to the parties at the time of negotiating, this difficulty may be cured by the simple insertion of a choice of law provision. [Id. at 1336].
We need not go so far today, since our case concerns policies written for a New Jersey operation that predictably sent waste products to New Jersey disposal sites. It is plainly an easier case.
Bell v. Merchants and Businessmen's Mut. Ins. Co., 241 N.J. Super. 557, 575 A.2d 878 (App.Div.), certif. denied, 122 N.J. 395, 585 A.2d 395 (1990), supports our view. There, a Pennsylvania insurer issued a "special multi-peril" policy of insurance to Pennsylvania residents covering eight Pennsylvania properties and two New Jersey properties. One of the New Jersey properties sustained fire damage. The policy required the insured to institute suit on the policy within twelve months "after inception of the loss." Pennsylvania courts interpret that to mean within twelve months of the casualty itself. New Jersey courts do not run the twelve months until the insurer formally denies liability. Plaintiffs' policy suit was timely under our interpretation of the policy language but untimely under Pennsylvania's. Citing New Jersey's significant governmental interest in the matter and Section 193 of the Restatement, we held for application of New Jersey law. See also Bernick v. Frost, 210 N.J. Super. 397, 510 A.2d 56 (App.Div.), certif. denied, 105 N.J. 511, 523 A.2d 158 (1986); Rutgers Cas. Ins. Co. v. State Farm Mut. Ins. Co., 234 N.J. Super. 202, 560 A.2d 722 (App.Div. 1989).
*64 Another recognition of the paramount interest of the state where the insured risk is located is Sandvik, Inc. v. Continental Ins. Co., 724 F. Supp. 303 (D.N.J. 1989). There, a New Jersey operation had a Pennsylvania plant whose waste went to a Pennsylvania disposal site. Remediation liabilities and toxic tort claims were made against Sandvik, and it sought a declaration in the United States District Court for New Jersey that its comprehensive general liability insurers covered the liabilities and claims.
The insurers moved to transfer the case to the Eastern District of Pennsylvania, the location of the disposal site, for the convenience of the parties and witnesses. The District Court ordered the transfer. Although the bases for that decision differ in many respects from ours, the discussion of Pennsylvania's significant interests in the subject matter supports our view on that subject and Judge Brotman's in Leksi. We also note the evaluations of Westinghouse in Sandvik, id. at 312; Union Carbide Corp. v. Aetna Cas. & Sur. Co., 212 Conn. 311, 320, 562 A.2d 15, 20 (1989); Travelers Indem. Co. v. Allied-Signal, Inc., 718 F. Supp. 1252, 1257-1258 (D.Md. 1989); San Filippo v. Bongiovanni, 743 F. Supp. 327 (D.N.J. 1990).
In sum, we see uniform interpretation of policy language as desirable, but not truly achievable. If it is associated with the state of contracting, in these circumstances it is associated with an arbitrary and usually irrelevant choice, one which was downgraded for casualty insurance policies by Restatement § 193. If uniformity is achieved on a site-specific basis, the uniformity will relate to a particular legal proceeding and may aid in its resolution. The cost, however, is that it cannot help but make some multistate insurance policy language mean one thing in one state and something else in another.

II.
We have decided only the conflicts issue relating to the "sudden and accidental" language, not only because it is an *65 obviously significant issue and ready for decision, but also because we are uncertain what other issues exist or will develop in this litigation. Suit is at an early stage. It is already obvious that there are other coverage issues, and experience teaches that there will be more. It is not possible to say in advance what state's substantive law should control them.
Conflicts principles do not dictate that all legal issues presented by a single case should be decided under the laws of a single state. Indeed, the evaluation of significant relationships and governmental interests takes place issue by issue and can lead to the application of different bodies of law. The Restatement recognizes this basic truth and so does at least one reported decision.
Restatement § 188, see page 55, 593 A.2d at 369, supra, refers to the rights and duties of the parties "with respect to an issue in contract" and refers them to the local law of the state "which, with respect to that issue, has the most significant relationship to the transaction...." Later in § 188 appear "the law applicable to an issue" and "relative importance with respect to the particular issue." Restatement § 193, which also appears on page 55, 593 A.2d at 369, supra, refers casualty insurance contract disputes to the law of the state of the principal location of the risk "unless with respect to the particular issue, some other state has a more significant relationship...."
The quoted language makes it plain that different local law may determine different issues in the same coverage suit. A good example is Independent Petrochem. Corp. v. Aetna Cas. & Sur. Co., 674 F. Supp. 354 (D.D.C. 1987). Plaintiff sought coverage from a number of comprehensive general liability insurers for some 60 claims in Missouri state courts resulting from plaintiff's spraying of petroleum products allegedly containing dioxin. The U.S. District Court for the District of Columbia ruled that Missouri law controlled the "trigger of coverage" issue on the thesis that the location of the insured risk was the paramount consideration. The court was then *66 faced with a motion by one of the insurers, INA, for judgment in its favor because plaintiff had failed to disclose, when seeking insurance from INA, the existence of several dioxin-related cases unknown to INA that had been filed in the years before the INA policy. Such nondisclosure, the argument ran, voided the INA policy.
As to that issue, the District Court held that Florida law controlled, because Florida was where negotiation and contract formation occurred. Its interest was paramount, therefore, in seeing its laws applied to the conduct of parties negotiating for insurance in its jurisdiction. The court pointed to a Florida statute fixing consequences of innocent, fraudulent and material misrepresentations by insurance applicants.
The point is that the law of different states can control the decision of different issues that can arise in coverage litigation, depending on the significance of the states' relationships to the facts and consequences bearing on each issue, and on the governmental concern with its outcome. For that reason it is a rare multistate environmental coverage case that lends itself to a threshold choice-of-law determination for every issue that could conceivably arise. This is not one of the rare cases.
Reversed.
NOTES
[1] For example, Continental Casualty Company and American Casualty Company issued policies in the late 1960's and early 1970's to entities with names similar to JMI. These insurers deny that JMI is even an insured under these policies.
[2] Sec. 188. Law Governing in Absence of Effective Choice by the Parties

(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.
(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
(a) the place of contracting,
(b) the place of negotiation of the contract,
(c) the place of performance,
(d) the location of the subject matter of the contract, and
(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.
These contacts are to be evaluated according to their relative importance with respect to the particular issue.
(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189-199 and 203.
[3] The factors are:

(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) case in the determination and application of the law to be applied.
[4] We recognize that there are unresolved factual issues in that regard. We do not intend to foreclose or decide them by stating the assumptions on which the choice-of-law question must be decided.
[5] Another possibility might be to plainly say something like, gradual leakage of pollutants is not sudden and accidental.