**GENERAL CERAMICS INC., National Beryllia Division,**

v.

**FIREMEN'S FUND INSURANCE COMPANIES; The St. Paul Property and Liability Insurance Company; Home Insurance Company; Marine Insurance Company; Hartford Insurance Company; Union Indemnity, C/O State of New York Insurance Department Liquidation Bureau; Greater Atlantic Insurance Company;**

General Ceramics, Inc., National Beryllia Division, a Corporation of the State of New Jersey, Appellant.

No. 94–5371.

United States Court of Appeals, Third Circuit.

Argued Feb. 14, 1995.

Decided Sept. 21, 1995.

---

David C. Dixon (argued), Scangarella & Feeney, Pompton Plains, NJ, for appellant.

Wendy L. Mager (argued), Jay M. Tuckerman, Smith, Stratton, Wise, Heher & Brennan, Princeton, NJ, for appellee, Home Insurance Co.

Laura A. Foggan, Daniel E. Troy, Stephen D. Goldman, Tanja E. Hens, Wiley, Rein & Fielding, Washington, DC, for amicus curiae, Insurance Environmental Litigation Association.

Before: STAPLETON, GREENBERG and COWEN, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

This is an action for a declaratory judgment that a standard comprehensive liability insurance policy covers a liability incurred under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601–9675. Central to its resolution is a choice-of-law issue governed by New Jersey's choice-of-law rules. We must decide whether New Jersey or Pennsylvania law controls the interpretation of an exception to a pollution-exclusion clause when New Jersey has significant contacts with the insurance contract and the insured but Pennsylvania is the site of the hazardous waste site giving rise to the liability for which coverage is sought. Based on the strong public policy that underlies New Jersey's broad interpretation of the pollution-exclusion exception, we conclude that the Supreme Court of New Jersey would hold the New Jersey law governs this dispute. Because the district court applied Pennsylvania law and granted summary judgment in favor of the insurer on that basis, we will reverse.

## I.

The insured, General Ceramics, Inc.,[1] is a New Jersey company that manufactures high temperature beryllium oxide ceramics at its main manufacturing plant in Haskell, New Jersey. Until 1991, all of General Ceramic's corporate, manufacturing, marketing, and sales operations were located at the Haskell, New Jersey facility. Between December 1977 and October 1978, approximately five shipments of contaminated waste from the Haskell facility were transported by private waste haulers to a resource recovery and processing facility in McAdoo, Pennsylvania ("the McAdoo site").

In 1981, General Ceramics received notice from the United States Department of Environmental Protection ("EPA") and the Pennsylvania Department of Environmental Resources that these agencies were investigating contamination at the McAdoo site. This investigation led to a request that General Ceramics remove from the site approximately 115 drums allegedly containing toxic waste. General Ceramics complied with that request. In 1987, a proposed consent decree for clean-up, monitoring, and remediation of the McAdoo site was filed with the District Court for the Eastern District of Pennsylvania. The EPA then filed a civil action in that court, pursuant to CERCLA, against General Ceramics and others, seeking damages and injunctive relief, and incorporating the provisions of the consent decree. Through September 1991, General Ceramics had expended approximately $132,000 in clean-up and remediation costs pursuant to the McAdoo site consent decree. In October 1992, General Ceramics notified its insurers of the environmental claims pending against it.

Between December 1972 and December 1978, Home Indemnity Company (referred to in the caption as "Home Insurance Company" and in this opinion as "Home" or "the insurer") had issued seven liability polices to General Ceramics, each covering approximately a one year period. Home is incorporated in New Hampshire and has its principal place of business in New York. The policies were obtained through a New York insurance broker. All of the policies listed Haskell, New Jersey as the insured's address; all policies were maintained and counter-signed there; and all premium notices were sent to and paid from that address.

The Home policies provided coverage for "bodily injury [or] property damage ... caused by an occurrence." (*See, e.g.,* app. at 84.) "Occurrence" was defined in the policies as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." (*See, e.g.,* app. at 78.) The policies also contained the following standard exclusion clause applicable to bodily injury and property damage resulting from pollution:

This insurance does not apply:

.   .   .   .   .

(f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fames, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.*

(*See, e.g.,* app. at 84 (emphasis added).)

After giving Home notice of the EPA claims against it, General Ceramics filed an action in the Superior Court of New Jersey against Home and a number of other insurers seeking a declaration that any liability in connection with the McAdoo site environmental claims was covered by General Ceramics's insurance policies. After removal to the United States District Court for the District of New Jersey, summary judgment was granted in favor of Home, and General Ceramics's cross-motion for summary judgment was denied. The district court determined that Pennsylvania law applied, that the discharge of the pollution in this case had been

---

1. General Ceramics was formerly known as National Beryllia Corporation and is so identified on the relevant insurance policies.

gradual and not abrupt, and that under Pennsylvania law the gradual discharge of pollutants was not covered under the "sudden and accidental" exception to the pollution-exclusion clause. Accordingly, the damage at the McAdoo site resulting from General Ceramics's delivery of waste over a one year period was not covered. General Ceramics promptly filed a notice of appeal.

Both before and shortly after the district court granted summary judgment to Home, the other defendant insurance companies were voluntarily dismissed from the action with prejudice.

■ The district court had jurisdiction over this diversity action pursuant to 28 U.S.C. § 1332. We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291. Although at the time General Ceramics filed its notice of appeal on June 21, 1994, claims remained pending against other defendant insurers, General Ceramics's premature notice of appeal ripened when the remaining defendants were dismissed from the action on July 25 and July 26, 1994. Because this court had not yet taken any action on the appeal at that time, we may assert appellate jurisdiction over the prematurely filed appeal. *See New Castle County v. Hartford Accident & Indem. Co.*, 933 F.2d 1162, 1178 (3d Cir.1991) (citing *Cape May Greene, Inc. v. Warren*, 698 F.2d 179 (3d Cir.1983)).

General Ceramics raises three issues on appeal: (1) whether the district court erred when it determined under New Jersey's choice-of-law rules that Pennsylvania law applies to the interpretation of the insurance contract provisions, (2) whether under Pennsylvania law the pollution-exclusion clause bars recovery, and (3) whether there existed substantial issues of material fact precluding summary judgment. Because we conclude that application of New Jersey's choice-of-law rules require application of New Jersey law, we do not reach the second issue. Because the district court granted summary judgment on the basis of Pennsylvania substantive law and because genuine issues of material fact preclude summary judgment

under New Jersey law at this juncture, we will reverse and remand for application of New Jersey law in further proceedings.

■ In reviewing a grant of summary judgment, we apply the same test that the district court should have used initially. *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 76 (3d Cir.1990), *cert. denied*, 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. The allegations of the party opposing the motion are taken as true and inferences are drawn in a light most favorable to the non-movant. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). In responding to a motion for summary judgment, however, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(e)). The district court's application of New Jersey's choice-of-law rules involves the application of legal principles and therefore is subject to plenary review.

## II.

■ A choice-of-law issue arises in this case because Pennsylvania and New Jersey law differ regarding the interpretation to be given the "sudden and accidental" discharge exception found in the pollution-exclusion clause of standard comprehensive liability policies like those issued by Home to General Ceramics.[2] Pennsylvania's intermediate appellate courts have consistently held that the "sudden and accidental" exception does not extend coverage for gradual discharges of pollution. *See, e.g., O'Brien Energy Sys.,*

---

2. The parties do not contend that the law of Home's state of incorporation, New Hampshire, or its principal place of business, New York, should apply. We accordingly do not consider the law of those states.

*Inc. v. American Employers Ins. Co.*, 427 Pa.Super. 456, 629 A.2d 957, 962 (1993), *appeal denied*, 537 Pa. 633, 642 A.2d 487 (1994); *Lower Paxon Township v. United States Fidelity & Guar. Co.*, 383 Pa.Super. 558, 557 A.2d 393, 398–402 *appeal denied*, 523 Pa. 649, 567 A.2d 653 (1989). Instead, continuous or repeated exposure to pollution that results in unexpected and unintended damage will be covered only when the discharge is *abrupt* and unexpected. *See Lower Paxon*, 557 A.2d at 402. This court has predicted that the Pennsylvania Supreme Court would follow the analysis of these Pennsylvania Superior Court decisions, and we, of course, are bound by that prediction. *Northern Ins. Co. v. Aardvark Assocs., Inc.*, 942 F.2d 189, 193 (3d Cir.1991).

▮ Under New Jersey law, on the other hand, the unintended discharge of pollutants is covered under the "sudden and accidental" exception even when the discharge was gradual and not "abrupt." *Morton Int'l, Inc. v. General Accident Ins. Co.*, 134 N.J. 1, 629 A.2d 831, 870, 875 (1993), *cert. denied*, — U.S. —, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994). Thus, assuming that the pollution damage in this case was unintended and unexpected, the dumping of General Ceramics's toxic waste at the McAdoo site would only be covered under Pennsylvania law if the discharge of the pollution at the site was accidental and occurred abruptly, whereas General Ceramics would receive coverage under New Jersey law even if the discharge was gradual. To resolve this case, we accordingly must decide whether to apply New Jersey or Pennsylvania law.[3]

### III.

▮ A federal court exercising diversity jurisdiction is to apply the choice-of-law rules of the forum state. *Shuder v. McDonald's Corp.*, 859 F.2d 266, 269 (3d Cir.1988) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). Accordingly, we apply New Jersey's choice-of-law analysis in this case. That task is facilitated here because the New Jersey Supreme Court recently gave a detailed explanation of its choice-of-law analysis in an insurance coverage dispute similar in many respects to the one presented in this case.

In *Gilbert Spruance Co. v. Pennsylvania Manufacturers' Association Insurance Co.*, 134 N.J. 96, 629 A.2d 885 (1993), an insured brought suit against its insurer for a declaration of coverage in connection with multiple toxic tort and environmental clean-up actions. The insured was a Pennsylvania corporation that manufactured paint at a Pennsylvania facility. During the 1970s and 1980s, this manufacturer entered into contracts with independent waste haulers who transported waste from the manufacturer's Pennsylvania facility to various dump sites in New Jersey. The insurance company was also a Pennsylvania corporation. The relevant policies were negotiated and countersigned in Pennsylvania, and the premiums were paid in Pennsylvania as well. The relevant polices at issue in *Gilbert Spruance*, like the policies at issue here, contained the standard pollution-exclusion clause with the exception for "sudden and accidental" discharge.

The court was forced to decide whether New Jersey or Pennsylvania law would govern whether the phrase "sudden and accidental" extended coverage for the gradual discharge of pollution. The court recognized that absent a choice-of-law provision in a contract, the law of the place where a con-

---

**3.** Amicus curiae Insurance Environmental Litigation Association maintains that there is no choice-of-law problem because intentional discharges are not covered by either jurisdiction's interpretation of the pollution-exclusion clause, and the evidence indicates that General Ceramics intentionally discharged known pollutants. It does not appear from the record that the intentionality of the discharge formed the basis of Home's motion, however. Moreover, the only pertinent evidence in the record relating to intentionality is that General Ceramics knew it was shipping beryllium oxide contaminated waste.

The delivery of contaminated waste for disposal at a landfill is not as a matter of law either an intentional discharge or the intentional creation of pollution damage under either state's substantive law. Thus, for purposes of our review of Home's summary judgment motion, we assume that the discharge was unintentional and hold that a conflict between Pennsylvania and New Jersey law therefore exists. *See Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

tract is entered into traditionally has determined the rights of the parties under the contract. It also noted, however, that New Jersey has "rejected the mechanical and inflexible *lex loci contractus* rule" in cases concerning liability insurance contracts in favor of "a more flexible approach that focuses on the state that has the most significant connections with the parties and transactions." 629 A.2d at 888. This more flexible approach is that of the *Restatement (Second) of Conflict of Laws* (1969).

Several *Restatement* provisions were relevant to the court's analysis: § 188, § 6, and § 193. Section 188(1) of the *Restatement* provides:

The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

Section 188(2) sets forth a non-exclusive list of "contacts" to be used in contract cases when determining what state may have an interest relevant for the purpose of § 6 analysis.

In relevant part, § 6 of the *Restatement* provides:

When there is no [statutory] directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Finally, § 193 of the *Restatement* establishes a presumption with respect to casualty insurance contract issues in favor of the law of the "state which the parties understood was to be the principal location of the insured risk during the term of the policy." That law is to be applied "unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6." Comments to § 193 note that the situs of the insured risk is less significant when the policy concerns a "movable risk" or multiple risks located in more than one state. § 193 cmt. b; *see Gilbert Spruance*, 629 A.2d at 889.

Drawing on these *Restatement* provisions, the New Jersey Appellate Division in cases prior to *Gilbert Spruance* had developed two main choice-of-law rules to govern insurance disputes arising out of environmental clean-up actions: the "uniform-contract-interpretation approach" and the "site-specific approach." *Id.* at 889–93. Under the uniform-contract-interpretation approach the law of a single state must be selected to govern the interpretation of coverage under a casualty insurance policy, even where the policy covers risks in a number of different states. The single state is chosen on the basis of a § 6 analysis.

The site-specific approach, as set forth in *Restatement* § 193, provides that more than one state's law may govern coverage questions arising under a casualty policy. In a case where the policy covers risks located primarily in a single state, a court applying the site-specific approach will presume that the law of that state will govern the coverage issue unless and until someone shows that another state has a more significant interest. Where, however, the subject matter of the insurance is predictably multi-state, the significance of the principal location of the insured risk diminishes. *Gilbert Spruance*, 629 A.2d at 893. In such cases, there is no presumption and "the governing law is that of the state with the dominant significant relationship according to the principles set forth in *Restatement* section 6," applied with reference to the particular controversy involved and not merely to parties and the circumstances of the original contract. *Id.*

The *Gilbert Spruance* court opted against the uniform-contract-interpretation rule, em-

phasizing the reasoning of cases such as *Johnson Matthey Inc. v. Pennsylvania Manufacturers' Association Insurance Co.*, 250 N.J.Super. 51, 593 A.2d 367 (App.Div.1991). The Appellate Division in that case had ruled that the uniform interpretation of policy language, while desirable, does not justify courts ignoring "the significant governmental interest[s] of the various jurisdictions where the insured risks are located," such as "New Jersey's paramount interest in the remediation of toxic waste sites [and] the fair compensation of victims of pollution." 593 A.2d at 370–71.

Under the § 193 site-specific approach, the court ordinarily would have turned then to the particular facts of the case before it to resolve "the knotty problem of how to determine where the insured 'risk' is located." *Gilbert Spruance*, 629 A.2d at 894. There were "two potential principal locations of risk," however—the state of generation and the state of disposal—and no principled way of choosing between the two. The court stated:

> We are thus presented with two options: we can arbitrarily choose either the state of generation ... or the state of disposal ... as the principal location of the insured risk, and assign section 193 significance to that state; or "because the risk at issue here was to some degree transient, a more extended analysis pursuant to § 6(2) is appropriate to determine whether, apart from or in addition to § 193 significance, [New Jersey] or [Pennsylvania] has a more significant relationship to the transaction and the parties." [*A. Johnson & Co., Inc. v. Aetna Casualty & Sur. Co.*, 741 F.Supp. 298, 301 (D.Mass.1990), *aff'd*, 933 F.2d 66 (1st Cir.1991).] We choose the latter.

629 A.2d at 894.

Applying the § 6(2) factors to the case before it, the court then held that when "out-of-state generated waste foreseeably comes to rest in New Jersey," New Jersey has the "dominant significant relationship" and New Jersey law should govern. *Id.* In reaching that result, the court emphasized that New Jersey's interpretation of the "sudden and accidental" exception furthered New Jersey's interest in the health and safety of its citizens by securing financial resources both to remediate New Jersey toxic-waste sites and to compensate victims of New Jersey pollution.

Notably, the *Gilbert Spruance* court expressly chose *not* to address the situation in which New Jersey-generated waste predictably ends up in another state. The court stated:

> Specifically we express no view on the proposition stated in *J. Josephson, Inc., [v. Crum & Forster Insurance Co.*, 265 N.J.Super. 230, 626 A.2d 81, 86 (Law Div. 1993) ], that when another state is the foreseeable location of the waste-site, the court must engage in a section 6 analysis to determine if that state has the most significant relationship with the parties, the transaction, and the outcome of the controversy—an analysis that requires the court "to sift through and analyze, however laborious [the task], the competing and varied interests of the states involved."

*Gilbert Spruance*, 629 A.2d at 894.

## IV.

The district court in this case relied on the analysis in *Gilbert Spruance* to determine that Pennsylvania law should apply to this contract dispute. Specifically, the district court determined that application of the factors in § 6(2) warranted this result because (a) the reasonable expectations of the parties would not be disrupted, (b) the needs of interstate commerce would be protected because local governments would be better able to control the disposal of toxic waste within their borders, and (c) applying Pennsylvania law would serve the overriding policy of allowing a state government to effectively control the protection of its environment. (App. at 21–22.).

It is tempting to extract the following bright-line rule from *Gilbert Spruance*: The state in which the waste disposal site is located has the most significant contacts with the subject matter of the litigation—the clean-up of a hazardous waste site—and therefore that state's substantive law should be applied as long as it was reasonably foreseeable to the contracting parties that the insured's waste

could predictably come to rest in that state. Certainly this rule would explain the outcome in *Gilbert Spruance.* New Jersey had the most significant contacts with the subject matter of the litigation because its environmental policies were implicated where the hazardous waste site was located within its borders and it was foreseeable that waste created in Pennsylvania would come to rest in New Jersey. This rule is not only attractive because of its simplicity, but also because on a surface level it appeals to our general notions of fairness. Although Pennsylvania had the more significant contacts with the insured and the insurance policy in *Gilbert Spruance,* New Jersey's overriding interest in protecting its environment was sufficient to overcome Pennsylvania's interest in applying its contract interpretation rules to a Pennsylvania insurance contract. It would thus only seem fair if in the reverse situation, Pennsylvania's environmental policies would override New Jersey's contract interpretation rules.

Despite their appeal and simplicity, we reject both this rule and this conclusion for two reasons. First, the *Gilbert Spruance* court itself rejected such a rule as "arbitrary," opting instead for " 'a more extended analysis pursuant to § 6(2)' " to determine which state " 'has a more significant relationship to the transaction and the parties.' " 629 A.2d at 894 (quoting *A. Johnson & Co., Inc. v. Aetna Casualty & Sur. Co.,* 741 F.Supp. 298, 301 (D.Mass.1990)). Second, this conclusion is (a) inconsistent with the New Jersey policy reasons justifying the *Morton International* court's broad interpretation of the phrase "sudden and accidental," and (b) fails to further the Pennsylvania policy reasons for giving that phrase its literal meaning.

### A.

■ Under the *Restatement* analysis embraced by the New Jersey Supreme Court in *Gilbert Spruance,* we must adopt the law of the state which "the parties understood was to be the primary location of the insured

risk" unless "some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties." *Gilbert Spruance,* 629 A.2d at 893 (quoting § 193). The location of the risk has less significance where the subject matter of the insurance is an operation or activity that is predictably multistate. *Id.*

The dumping that caused the pollutant discharges giving rise to the claims in this case occurred from December 1977 to October 1978. Thus, only the last two policies entered between the parties are relevant to the issues before us. The last, having a policy term from December 1978 to December 1979, refers to only a New Jersey plant site. The second-to-last policy, having a policy term from December 1977 to December 1978, and all previous policies, listed both General Ceramics's Pennsylvania plant site [4] and its New Jersey site. While all manufacturing in Pennsylvania had ceased by the time the penultimate contract was entered, there is no evidence in the record as to whether Home was aware of this fact.

General Ceramics argues on these facts that the relevant policies did not insure against a multi-state risk and that the principal location of the insured risk was clearly New Jersey. Home argues, on the other hand, that this is a multi-state risk case. It stresses the history of the contractual relationship and the fact, found by the district court, that disposal of waste from the New Jersey plant site in the nearby state of Pennsylvania was clearly foreseeable.

■ We find it unnecessary on the facts of this case to solve "the knotty problem of how to determine where the insured 'risk' is located." *Gilbert Spruance,* 629 A.2d at 894. Since the site of generation was in New Jersey and it was foreseeable that disposal would occur in nearby Pennsylvania, the risk here, like the risk in *Gilbert Spruance,* "was to some degree transient." *Id.* Accordingly, to choose the applicable law for the issue before us, we turn, as did the court in that case, directly to a § 6(2) analysis.

---

**4.** In 1971, General Ceramics purchased a polysilicon manufacturing plant in Plumbsteadville, Pennsylvania. That facility was closed in approximately December 1974 and was sold in October 1978.

### B.

The seven "relevant factors" listed in § 6(2) may be grouped into five different categories of interests. The first category, consisting of factors (b) and (c), requires a court to focus on the purposes and policies behind each of the competing rules of law and the interests of each respective state in having its particular rules govern. The second category, consisting of factor (a), directs that a court, where interstate or foreign commerce is involved, consider the desirability of promoting mutually harmonious relationships between governmental entities. The third category of interests, consisting of factors (d) and (f), relates to the protection of justified expectations of the parties and to their needs for predictability of result. The fourth category of interests, consisting of factor (e), focuses on the basic policy underlying the particular field of law involved, and the fifth category, which embraces factor (g), requires the court to consider the concerns of judicial administration, such as which of the competing rules will simplify the determination and application of the applicable law.

■ Our analysis thus takes each interest group into account: the interests of commerce, the interests of the relevant states, the interests of the parties, the interests underlying the contract law, and the interests of judicial administration. We stress that, in line with the *Gilbert Spruance* and *Restatement* approaches, our consideration of these interests must be *rule and issue specific*—we must assess the effect on these interests of applying each of the competing rules to the particular issue involved. Because of the emphasis of the *Gilbert Spruance* court on the interests of the relevant states and because the identification of those interests is helpful to the remaining analysis, we begin with that interest group. Because the *Gilbert Spruance* court clearly believed the interests of judicial administration should yield to the other competing interests, we give very little emphasis to the last interest group.

### 1.

■ State interest analysis focuses on whether application of the state's law under the circumstances of the particular case will advance the policies that the law was intended to promote. Thus, the initial focus should be on what the legislature or court intended to protect by having that law apply to wholly domestic concerns, and then, whether those concerns will be furthered by applying that law to the multi-state situation. *See* Larry Kramer, *Rethinking Choice of Law*, 90 Colum.Law Rev. 277, 296–303 (1990). Only where each state has contacts with the litigation that implicate the reasons the law was enacted will there be a true conflict between the two states' laws. Where the purpose for which the law was enacted is not advanced by application in that case, there is no "true conflict" because the case would not be "connected to a state in such a way that the state wants to regulate [it]." Instead, "[a] multi-state conflict of laws exists only when contacts are distributed such that more than one state wants to regulate the case." *Id.* at 311.

■ The particular "law" at issue in this case is each state's judicial interpretation of the "sudden and accidental" exclusion exception. The New Jersey Supreme Court in *Morton International*, while recognizing that the word "sudden" ordinarily connotes a temporal element, nevertheless interpreted the phrase broadly to permit coverage even when the discharge of pollution is gradual and not "abrupt."

In reaching that result, the court focused on the process by which the pollution-exclusion clause received New Jersey regulatory approval as part of the standard Comprehensive General Liability policies ("CGL policies"). The court noted that during the approval process, the insurance industry had represented to the New Jersey Department of Insurance and other states' regulatory agencies that the pollution-exclusion clause was intended to clarify the scope of coverage for pollution damages and would not significantly limit the coverage already available. *See, e.g.*, 629 A.2d at 849–54. Aware that regulatory approval of this clause in essence had been the only arms-length negotiation in which the insurance companies participated since once a clause became part of the standard CGL policy, insureds had little opportu-

nity to negotiate a variation of it, the court refused to give effect to its literal meaning. It explained:

> The critical issue is whether the courts of this state should give effect to the literal meaning of an exclusionary clause that materially and dramatically reduces the coverage previously available for property damage caused by pollution, under circumstances in which the approval of the exclusionary clause by state regulatory agencies was induced by the insurance agency's representation that the clause merely "clarified" the scope of prior coverage.

*Morton Int'l,* 629 A.2d at 872. As further support for its conclusion that the clause should not be interpreted to reduce coverage, the court noted that regulatory approval had not been accompanied by a request for lower premiums based on the assumption that the insurance industry was not decreasing available coverage.

New Jersey thus interprets "sudden and accidental" in a pro-coverage fashion out of concern for insureds who purchase coverage based on the state's regulatory approval of the standard CGL policies. The underlying policies prompting this interpretation are protection of the New Jersey insured (and of New Jersey insurance contract negotiation) and promotion of honesty before the state's regulatory agencies. *See Johnson Matthey,* 593 A.2d at 370 (describing New Jersey's interest in applying its insurance coverage law to environmental damages as "assuring that casualty insurance companies fairly recognize the legal liabilities of their insureds"). These interests are implicated here because the insured is a New Jersey corporation with its main plant and headquarters in New Jersey and the relevant insurance policy was negotiated and paid for in New Jersey.

The focus in *Morton International* on New Jersey's interest in protecting New Jersey's insureds and in promoting honesty before the state's regulatory agencies is therefore different from the focus in *Gilbert Spruance* on the New Jersey interests in environmental protection. Because *Gilbert Spruance* involved an out-of-state insured, an out-of-state policy, and out-of-state waste generation that resulted in in-state environmental damage,

the two interests justifying the result in *Morton International* were not implicated. Instead, the state interest implicated in *Gilbert Spruance* was New Jersey's interest in securing financial resources both to remediate New Jersey toxic-waste sites and to compensate victims of New Jersey pollution.

As noted, the Pennsylvania courts have rejected the argument that the term "sudden" in the pollution-exclusion clause is ambiguous and thus have consistently rejected claims that the "sudden and accidental" exception affords coverage for gradual discharges of pollution. Pennsylvania's interpretation of the pollution-exclusion clause reflects its interest in giving effect to the literal meaning of unambiguous contract terms. That interest at heart reflects a view that contracting parties are in the best position to ascertain their own needs and wants and that Pennsylvania will encourage a secure commercial environment if it enforces commercial agreements entered into between private parties as written but stays neutral on the substance of those agreements.

Pennsylvania's rule thus is designed to protect the contracting parties by giving them the freedom to bargain for and agree on the allocation of risk in the manner they think is best. The state interest in protecting the parties is implicated only when at least one of the parties is a Pennsylvania domiciliary, however. That interest thus is not implicated here because neither party to this suit is a citizen of Pennsylvania—General Ceramics is a New Jersey corporation and Home is incorporated in New Hampshire with its principal place of business in New York.

That General Ceramics's waste ultimately ended up in Pennsylvania does not change our analysis. We recognize that Pennsylvania could, if it so chooses, enact laws to allocate risk to further its interest in securing financial resources both to remediate the toxic-waste site and to compensate the victims of the pollution. It has chosen not to do so, however. Instead, Pennsylvania's policy of giving effect to the plain meaning of an unambiguous contract shows that it is not concerned with *how* the risk will be allocat-

ed,[5] leaving that decision to the contracting parties.

In sum, our examination of the purposes of each state's law reveals that only New Jersey's purposes are furthered by the application of its law to this case.

## 2.

The analysis of the remaining § 6 factors is straightforward. As noted, the first factor set out in § 6 directs the court, where interstate or foreign commerce is involved, to consider the desirability of promoting mutually harmonious relationships between governmental entities. Only the purposes of New Jersey's law are furthered by having its law applied in this case. Because Pennsylvania thus has no interest in having its law applied, applying New Jersey law will not disrupt Pennsylvania's regulatory efforts. The contrary result, on the other hand, would tend to disrupt New Jersey's efforts both to protect New Jersey insureds and to promote honesty before the state's regulatory agencies. We thus conclude that applying New Jersey's law in this case is the best way promote mutually harmonious relationships between New Jersey and Pennsylvania.

The next category of factors set out in § 6 directs the court to consider the justified expectations of the parties and their needs for predictability of result. That the *Gilbert Spruance* court rejected both the "uniform-contract-interpretation" approach and the bright-line approach of choosing the law of either the state of waste generation or waste disposal shows that the New Jersey Supreme Court favors an approach sensitive to significant government interests over the needs for predictability of result. Moreover, the relevant insurance policy in this case listed Has-

kell, New Jersey as the insured's address, the policy was maintained and counter-signed there, and all premium notices were sent to and paid from that address. Thus, that New Jersey law is applied here can hardly be called unexpected.

The fourth category of factors to be considered is the basic policies underlying the particular field of law. The *Restatement* explains:

> This factor is of particular importance in situations where the policies of the interested states are largely the same but where there are nevertheless minor differences between their relevant local laws. In such instances, there is good reason for the court to apply the local law of that state which will best achieve the basic policy, or policies, underlying the particular field of law involved.

§ 6 cmt. h.

This factor is less important here because the relevant policies of the two interested states are quite different: while Pennsylvania is interested giving effect to the plain meaning of the contract, New Jersey is interested both in protecting insureds and promoting honesty before the state's regulatory agencies. Because only the purposes of New Jersey law are implicated here, applying New Jersey law "will best achieve the basic [New Jersey] policy."

The final factor requires the court to consider the interests of judicial administration. The idea behind this factor is that "[i]deally, choice-of-law rules should be simple and easy to apply." § 6 cmt. j. We do not think that the choice-of-law rule set forth in this opinion will be particularly difficult for courts to apply. We also observe that the *Restatement* has cautioned that "[t]his policy should

---

**5.** Nor is there any suggestion that Pennsylvania's decision not to adopt the pro-coverage version of the "sudden and abrupt" rule was motivated by a determination that by enforcing the literal meaning of the phrase, the parties would tend to allocate the risk to maximize the funds available for remediation and compensation.

We recognize that one court has stated that by denying coverage for gradual pollution, Pennsyl-

vania gives manufacturers an incentive to take steps to avoid gradual unintentional pollution activities. *Koppers Co., Inc. v. Aetna Cas. & Surety Co.*, 840 F.Supp. 390, 394 (W.D.Pa.1993). We disagree. Pennsylvania is not in fact denying coverage at all; instead, the contract entered into by the parties itself denies coverage. Pennsylvania merely enforces that contract.

not be overemphasized, since it is obviously of greater importance that choice-of-law rules lead to desirable results." *Id.* As noted, the *Gilbert Spruance* court placed very little emphasis on this factor, purposefully eschewing more mechanical choice-of-law determinations in favor of an approach sensitive to the purposes behind each state's law. This is understandable: New Jersey's interpretation of the "sudden and accidental" exception reflects a strong state policy.

### V.

The district court granted summary judgment in favor of the insurer on the basis of its determination that Pennsylvania law governed the interpretation of the policy and its conclusion that the discharge in this case was not sudden. Because of its view that Pennsylvania law applied, the district court failed to address whether General Ceramics's discharge and the ensuing damage was unintentional or unexpected. Because we conclude that New Jersey law should govern this dispute, the district court's grant of Home's motion for summary judgment will be reversed. Upon remand, the district court will need to address whether General Ceramics's discharge was unintentional and whether the damage was unintended or unexpected.

### VI.

For the foregoing reasons, we will reverse the judgment of the district court and remand for further proceedings consistent with this opinion.